H. Floyd McGAHEE,
Plaintiff–Appellant,

v.

NORTHERN PROPANE GAS COMPANY, Defendant–Appellee.

No. 87–8379.

United States Court of Appeals,
Eleventh Circuit.

Oct. 27, 1988.

James L. Paul, Russell R. Grosse, Gambrell, Clarke, Anderson & Stolz, Atlanta, Ga., Frank C. Vann, Camilla, Ga., for plaintiff-appellant.

Emmet J. Bondurant, Jane F. Vehko, Bondurant, Mixson & Elmore, Atlanta, Ga., for defendant-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and LYNNE *, District Judge.

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

LYNNE, Senior District Judge:

Plaintiff-appellant H. Floyd McGahee (McGahee) brought this antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a), against defendant-appellee Northern Propane Gas Company (Northern Propane). The district court granted Northern Propane's motion for summary judgment and entered judgment against McGahee. *McGahee v. Northern Propane Gas Co.*, 658 F.Supp. 189 (N.D.Ga.1987) (Shoob, J.). We reverse.

## I. FACTS

McGahee and Northern Propane are retail distributors of propane, a fuel used for heating. Retail distributors primarily have two types of customers: (1) residential and (2) commercial. Generally, distributors sell propane to commercial users at a lower price. Because propane is a fungible good, price is of prime importance in its unregulated market.

At the time relevant to this action, Northern Propane operated 180 retail distribution outlets in twenty-five states. One of these retail distribution outlets was based in Camilla, Georgia. Northern Propane produces and buys propane in western states and comingles the propane with other companies' propane to transport it by pipeline to Georgia. The Northern Propane district office in Camilla then takes delivery of the propane at the pipeline terminal.

In a March 1982 internal report, Northern Propane described the propane market in the Camilla district (approximately Mitchell and Baker Counties). Northern Propane estimated it had sixty percent of the total propane market within the district. Northern Propane estimated Petrolane had twenty percent of the market, but regarded Petrolane as competition only for large volume commercial accounts. Northern Propane also estimated that five competitors, working within the edges of the district, split the remaining twenty percent. Because transportation costs restrict economical delivery of propane to a twenty-five to thirty mile radius from the storage tanks and because these five competitors were based outside of the Camilla district, these competitors were only competitive with Northern Propane on the edge of the Camilla district to which they were closest. In addition, Northern Propane stated that, of other possible fuels, only "free" wood posed a competitive threat to propane in the Camilla district and that conversion to wood had stabilized.[1]

When Northern Propane bought the retail distribution outlet in Camilla, Floyd McGahee was its district manager. McGahee had become a fixture in the Camilla area, having worked at the same propane outlet for approximately thirty years. In June 1981, Northern Propane demoted McGahee to a salesperson position because, according to Northern Propane, he failed to keep adequate records, to keep the accounts receivable current, and to follow company directives. McGahee resigned from Northern Propane on October 9, 1981, under contentious circumstances.[2]

After resigning from Northern Propane, McGahee obtained an $800,000 Small Business Administration (SBA) loan to finance his April 1982 entry into the propane business in the Camilla area. By February 1982, Northern Propane had obtained a copy of McGahee's SBA loan documents

---

1. For the purpose of this summary judgment motion, Northern Propane accepted that the relevant geographic market is Mitchell and Baker Counties in southwest Georgia and that the relevant product market is propane. The district court suggested that it had difficulties with this definition of the relevant markets. *McGahee*, 658 F.Supp. at 192 n. 3. The Northern Propane internal report discussing the markets does support this definition of the relevant markets. *See* Plaintiff's Exhibit 87, p. IN01029. *Cf. Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 364–66 (9th Cir.1988) (holding market definition to be jury issue in case with similar facts).

2. Northern Propane filed a counterclaim against McGahee alleging that he had breached his fiduciary duties while its employee by wrongfully extending credit to McGahee Family, Inc., a corporation in which McGahee had a financial interest. Northern Propane voluntarily dismissed the counterclaim on February 25, 1985.

and other documents related to his financial position. Before McGahee's distributorship opened, a Northern Propane internal report stated that its new "district manager has taken the offensive and will fight the former employee for the market." At the end of March 1982, Northern Propane lowered its residential prices five cents per gallon and its commercial prices four cents per gallon.[3]

In late April 1982, McGahee opened for business. Not only did McGahee solicit Northern Propane's customers, he also hired three of Northern Propane's drivers and repairmen. McGahee's market share went from zero percent in 1981 to twenty-three percent in 1983, while Northern Propane's market share dropped from sixty or sixty-five percent in 1981 to thirty-five percent in 1983.[4] McGahee's success in acquiring a substantial share of the market was due both to his personal familiarity with the local community and to his willingness to compete with Northern Propane's prices. The direct head-to-head competition led to hard feelings, with Northern Propane's new district manager in Camilla referring to McGahee in internal documents as "Floyd The S.O.B." and setting "[c]on-

tribute to Floyd's financial problems" as a district goal for 1983.

During the price war, Northern Propane sold propane at prices below its average total cost. McGahee also contends that Northern Propane's own documents indicate that in some months Northern Propane sold propane to commercial customers at prices below average variable cost and cited documents that support this contention.[5] McGahee also contends that Northern Propane's own documents indicate that Northern Propane sold propane in the Camilla district at lower prices than in other districts and cites documents that support this contention.[6] Furthermore, Northern Propane furnished propane tanks in the Camilla district rent free while charging rent in other districts, realizing that McGahee would be limited in the number of tanks he could offer rent free.[7]

## II. STANDARD OF REVIEW

Our review of the district court's grant of summary judgment is plenary and is to be conducted utilizing the same legal standards as those imposed upon the district court. *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th

---

**3.** Plaintiff's Exhibit 5, *compare* p. COO333 *with* p. COO328.

**4.** These percentages are based on McGahee's estimates during his deposition. Logically, two competitors engaging in a price war in which other competitors do not participate should increase their combined share of the market. These percentages indicate that Northern Propane's and McGahee's combined share of the market decreased despite their price war. This anomaly is not explained in the record.

**5.** Compare the prices in Plaintiff's Exhibit 15, p. COO907, Plaintiff's Exhibit 16, p. COO851, and Gower's First Affidavit, Exhibit D, p. 2, lines 10–13 to the average variable costs in Gower's First Affidavit, Exhibit C, p. 3, lines 26–28. Northern Propane calls McGahee's contention "a blatant misrepresentation of the record," but fails to explain why the documents do not support McGahee's contention, except to claim one of the three documents concerning prices had a typographical error that was corrected later by Gower's Third Affidavit. On the other hand, McGahee merely gives prices and costs and cites their sources without fully explaining these numbers.

**6.** Northern Propane responds to this contention by calling it misleading and explains why, but does not support this explanation with evidence in the record. The district court assumes Northern Propane sold propane in the Camilla district at prices below those charged in other districts. *McGahee,* 658 F.Supp. at 197. In March 1982, Northern Propane's discount policy gave each individual district the option of offering, with regional office approval, cash discounts, class of customer discounts, and individual commercial customer discounts. Plaintiff's Exhibit 1, pp. C10O01–C10OO5. Northern Propane's internal documents show that its Camilla district offered these discounts.

**7.** Plaintiff's Exhibit 80, p. COO832.
   McGahee also contends that Northern Propane attempted to hinder and harass him by not picking up its tanks when requested by customers, refilling customers' tanks after being asked to disconnect them, and reporting McGahee to the State Fire Marshal for disconnecting Northern Propane's tanks. Unfortunately, the primary source McGahee cites to support these contentions of anticompetitive conduct is not part of the record on appeal; therefore, we do not consider them.

Cir.1985). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Three recent Supreme Court cases vacating appellate reversals of district court orders granting summary judgment illulminate the appropriate role of summary procedure. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A common theme found in these cases is that

> [s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1.

*Celotex,* 106 S.Ct. at 2555. In *Matsushita,* the Supreme Court made clear that summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition. 106 S.Ct. at 1360. For this reason, when opposing a motion for summary judgment, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct. *Id.* at 1357.[8]

### III. THE TEST FOR PREDATORY PRICING

■ A plaintiff must show two elements to establish an attempted monopoli-

zation claim under Section 2 of the Sherman Act: (1) the specific intent on the part of the defendant to achieve a monopoly and (2) a dangerous probability the defendant would succeed. *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.,* 786 F.2d 1115, 1118 (11th Cir.1986). The first element can be satisfied by proof of predatory pricing, *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), which is what McGahee has alleged in this case. A problem arises, however, in determining whether a defendant has engaged in predatory pricing.

■ A plaintiff who is a competing seller such as McGahee must show two elements to establish a Robinson–Patman Act claim: (1) the defendant, in the course of interstate commerce, discriminated in price between purchasers of commodities of like grade and quality and (2) a reasonable possibility that this price difference may harm competition. *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983); *FTC v. Anheuser–Busch,* 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). Price discrimination, the first element, is merely a price difference. *Anheuser–Busch,* 363 U.S. at 549, 80 S.Ct. at 1274. Harm to competition, the second element, can be satisfied by proof of predatory pricing.[9] *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). Again, the problem is determining whether a defendant has engaged in predatory pricing.

### A. The District Court's Test for Predatory Pricing.

In its opinion, the district court discusses the economic theory behind regulating predatory pricing, relying primarily on the work of Professors Areeda and Turner, in

---

8. Justification is not, however, an element of an antitrust plaintiff's prima facie case, but is an affirmative defense. 15 U.S.C. § 13(b) (Robinson–Patman Act); *e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (Sherman Act).

9. The predatory pricing issues are the same for Sherman Act Claims as for Robinson–Patman Act claims. *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 853 n. 16 (5th Cir. Unit B), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).

its quest for a test for determining when a defendant has engaged in predatory pricing. *McGahee*, 658 F.Supp. at 192–93. Although the district court discusses the test from *International Air Industries v. American Excelsior Co.*, 517 F.2d 714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), the district court adopts a test proposed by Areeda and Turner, modifying the test slightly to make it consistent with *International Air*. *McGahee*, 658 F.Supp. at 192 n. 5. *Cf. Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (decisions rendered by the former Fifth Circuit before October 1, 1981, are binding upon courts of the Eleventh Circuit). According to the district court,

> [i]n *International Air*, the former Fifth Circuit accepted Areeda and Turner's basic premises but added a significant gloss. Specifically, the court formulated a different standard for markets in which entry barriers are extremely high. In such cases, a plaintiff can prevail by showing that the defendant is "charging a price below its short-run, profit-maximizing price...." 517 F.2d at 724.

*McGahee*, 658 F.Supp. at 194.

The Areeda and Turner test has two primary rules for predatory pricing claims: (1) a price at or above the defendant's average variable cost[10] is conclusively deemed lawful and (2) a price below the defendant's average variable cost is conclusively deemed unlawful. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 733 (1975). Therefore, the Areeda and Turner test makes evidence of a defendant's subjective intent irrelevant; instead it relies wholly upon a comparison between prices and average variable cost.

In *International Air*, the plaintiff appealed a jury verdict for the defendant, arguing that the district court erred in refusing to direct a verdict in plaintiff's favor on its Robinson–Patman Act claim.

517 F.2d at 720. In arguing for judgment notwithstanding the jury verdict, the plaintiff relied on evidence concerning defendant's subjective intent from defendant's internal company memoranda and related circumstantial evidence. *Id.* at 721–23. The Fifth Circuit panel, however, said a court must apply objective evidence of predatory pricing, based on defendant's prices and costs, before it could rule as a matter of law against the defendant. *Id.* at 723. The court stated that

> [i]n order to prevail as a matter of law,[30] a plaintiff must at least show that either (1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.[31]

*Id.* at 724.

In footnote 30 of *International Air*, the Fifth Circuit panel added this *dicta:*

> Much of what we say here should be relevant to the requisite elements of a prima facie Robinson–Patman case. Indeed, in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696, n. 12, 702, n. 14, 87 S.Ct. 1326 [, 1333, n. 12, 1336, n. 14], 18 L.Ed.2d 406 (1967) the Supreme Court indicated that price below "cost" is perhaps, [sic] a necessary element of a prima facie case. However, because the Court repeatedly referred to "deteriorating price structure," the opinion may hold that it is not necessary to show a price below marginal cost in order to make out a prima facie case. To the extent that the opinion stands for the latter proposition, we limit our discussion to the elements necessary to sustain a motion for directed verdict.

*Id.* at n. 30. In determining the appropriate test, the district court extended the *dicta* "should be *relevant* to the prima facie elements" as used in footnote 30 of *International Air* and followed new Fifth

---

**10.** The Areeda and Turner test uses average variable cost, an accounting concept, as a surrogate for marginal cost, an economic concept. For definitions of variable cost and marginal cost, *see* P. Samuelson, *Economics* 467–68 (10th ed. 1976).

Circuit cases that have interpreted *International Air* as giving the elements of a plaintiff's prima facie case. *See Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984).

■ Accordingly, the district court applied the *International Air* test to defendant's motion for summary judgment. First, the district court found that the propane market had no significant barriers to entry.[11] Therefore, the district court did not apply the second part of the test—the "gloss"—from *International Air*. Then, the district court found that the plaintiff did not produce any evidence that the defendant sold propane below its average variable cost,[12] ignoring any evidence of defendant's subjective intent. *McGahee*, 658 F.Supp. at 192 ("the Court cannot and need not divine the intent behind defendant's pricing policy"). Following Areeda and Turner's proposed test, the district court concluded that "[t]hus, there is no issue for trial under *International Air*." *Id.* at 196.

The Areeda and Turner test is like the Venus de Milo: it is much admired and often discussed,[13] but rarely embraced.[14] Perhaps this reluctance to embrace is due to the substance from which it is formed. The Areeda and Turner test is carved from economic assumptions, not from antitrust statutes and judicial precedents. Perhaps this reluctance is due to attacks upon it.[15] The Areeda and Turner test has been criticized for being impractical,[16] for using stat-

---

**11.** The district court apparently focused on the lack of trade secrets, patents, and licenses in finding that there are no substantial barriers to entry in this market. Other factors, such as large capital outlays required to start a new business, the existence already of excess capacity by existing sellers, the price inelasticity of the market (*i.e.*, consumers do not consume much more if the price goes down or much less if the price goes up), and the difficulties buyers may have in changing suppliers are also relevant to this question. *See Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366–67 (9th Cir.1988) (upholding jury finding that local propane market had high barriers to entry).

**12.** McGahee brought to the district court's attention, several times, sales it contended were below average variable cost as average variable cost was computed by Northern Propane's expert. *See supra* note 5. Moreover, the district court expressed doubts about the allocation of variable and fixed costs by Northern Propane's expert, but made a factual finding nonetheless. *McGahee*, 658 F.Supp. at 196 n. 11. As this court has reiterated:

> [T]he district court must not resolve factual disputes by weighing conflicting evidence, *see Warrior Tombigbee Transportation Company v. M/V NAN FUNG*, 695 F.2d 1294, 1298 (11th Cir.1983), since it is the province of the jury to assess the probative value of the evidence, *see Odum v. Celotex Corp.*, 764 F.2d 1486, 1488 (11th Cir.1985). The district court must not "assess[ ] the probative value of any evidence presented to it, for this would be an unwarranted extension of the summary judgment device." *Gauck v. Meleski*, 346 F.2d 433, 436 (5th Cir.1965).

*Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir.1986); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986).

**13.** *See* Liebler, *Whither Predatory Pricing? From Areeda and Turner to Matsushita*, 61 Notre Dame L.Rev. 1052 (1986) (discussing the academic literature and summarizing 55 predatory pricing cases since Areeda and Turner's 1975 article).

**14.** By embraced, we mean adopted essentially as offered by Areeda and Turner. Arguably, both the Second and Fifth Circuits have embraced the Areeda and Turner test. *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The Fifth Circuit, however, carves an exception from the Areeda and Turner test for markets with high entry barriers. *Adjusters Replace–A–Car*, 735 F.2d at 891. For the various positions of our sister circuits, *see infra* nn. 38–44 & accompanying text; 3 Von Kalinowski, *Antitrust Laws & Trade Regulation* § 10.03[5] & Table 10.1 (1988).

**15.** For a lengthy list of academic articles criticizing the Areeda and Turner test, *see* E. Kintner, 2 *Federal Antitrust Law* § 13.3, 1988 Supplement to Vol. II, n. 102c (1980).

**16.** A key problem in any application of economics to litigation is that the economic definitions of cost have no counterparts in business accounting. Carstensen, *Predatory Pricing in the Courts: Reflection on Two Decisions*, 61 Notre Dame L.Rev. 928, 945 & n. 62 (1986). Areeda

ic short-run analysis,[17] and for being too permissive of predatory activity;[18] these criticisms break any notion that economists[19] agree that the Areeda and Turner test is best.[20] We, like our sister circuits other than the Second Circuit and the Fifth Circuit, our Siamese twin, decline to embrace the Areeda and Turner test.

### B. Our Quest For a Test For Predatory Pricing.

■ The case at bar presents an issue of first impression for the Eleventh Circuit.[21] What is the appropriate test for predatory pricing when an antitrust defendant moves for summary judgment or for a directed verdict? We begin our quest for a test at sources other than the thought provoking contributions of academics. We turn first to the antitrust statutes and judicial precedent. Based on these sources, we hold that when an antitrust defendant moves for

judgment as a matter of law, the test for predatory pricing must consider subjective evidence and should use average total cost[22] as the cost above which no inference of predatory intent can be made.

### 1. The Antitrust Statutes and Their Legislative History

■ Under 15 U.S.C. § 15, a private plaintiff such as McGahee may bring a civil action to recover threefold for damages for a violation of the substantive antitrust provisions. McGahee has alleged a Sherman Act claim and a Robinson–Patman Act claim. Predatory pricing is relevant to McGahee's claims because it is circumstantial evidence. In the Sherman Act claim, predatory pricing would be used to infer the intent necessary for an attempt to monopolize.[23] In the Robinson–Patman Act claim, proof of predatory pricing would be used to infer injury to competition.[24] On

and Turner have responded to this criticism by redefining average variable cost to include costs an accountant would consider fixed. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 715c, at 172–74, 176 (1978).

17. *E.g.,* Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284 (1977). Areeda and Turner's redefinition of average variable cost also blunts this criticism. *See supra* n. 16.

18. *E.g.,* R. Posner, *Antitrust Law: An Economic Perspective* 191–93 (1976); Greer, *A Critique of Areeda and Turner's Standard for Predatory Practices,* 24 Antitrust Bull. 233 (1979).

19. As a social science built on assumptions and statistics, economics is subject to the disparagement attributed by Mark Twain in his *Autobiography* to B. Disraeli: "There are three kinds of lies: lies, damned lies, and statistics."

20. For a summary of various alternative tests, *see* Calvani & Lynch, *Predatory Pricing Under the Robinson–Patman and Sherman Acts: An Introduction,* 51 Antitrust L.J. 375 (1983).

21. The former Fifth Circuit panels in *International Air Industries v. American Excelsior Co.,* 517 F.2d 714, 724 n. 30 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), and in *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 854 n. 17 (5th Cir. Unit B), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) recognized that at that time the Fifth Circuit, as well as the Supreme Court, had not established a definitive test for examining a plaintiff's prima facie case when a defendant

moves for summary judgment. The district court below also recognized that *International Air* did not establish the test that the Eleventh Circuit must use in evaluating a defendant's motion for summary judgment in an antitrust case based on predatory pricing. *McGahee,* 658 F.Supp. at 192 n. 5. *But see Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 890 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985) (attempting to harmonize *International Air* and *Malcolm* with *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300 (5th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 651 (1984)).

22. Average total cost is the sum of average variable cost and average fixed cost. P. Samuelson, *Economics* 469 (10th ed. 1976).

23. A distinction between a monopolization claim and an attempt to monopolize claim is that proof of specific intent is required for attempt claims. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 850–51 (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). By definition, an "attempt" to commit a crime, which is what a § 2 violation is, requires proof of (1) an intent to commit the crime, (2) an overt act toward its commission, (3) failure of consummation, and (4) the apparent possibility of commission. Black's Law Dictionary 116 (5th ed. 1979).

24. Actually, in a Robinson–Patman Act claim, a double inference is made. An inference is

one hand, over one hundred years ago, Congress could not have foreseen the development of antitrust law in general, much less have foreseen the present debate over the appropriate test for predatory pricing. On the other hand, the statutes and their legislative histories reveal Congress's intent, the linchpin in interpreting a statute, as to what conduct the antitrust statutes prohibit.

■ In relevant part, the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2.[25] The Congressional debates [26] in 1890 indicate that Congress believed that under the common law of the individual states, "these combinations [we]re illegal without statute." 21 Cong.Rec. 2458 (1890) (Senator Teller). The public outcry over monopolies and the inadequacy of the states' common law necessitated federal legislation regulating monopolies involved in interstate commerce.[27] Accordingly, Congress drafted and enacted a broad, general statute that borrowed from the common law. 21 Cong. Rec. 3152 (Senator Hoar); 21 Cong.Rec. 3148 (Senator Edmonds); 21 Cong.Rec. 2456 (Senator Sherman); *Standard Oil Co. v. United States*, 221 U.S. 1, 51, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1910); *see generally* Letwin, *Congress and the Sherman Anti-*

*trust Law: 1887–1890*, 23 U.Chi.L.Rev. 221, 240–47 (1956). Under the common law,

> prohibitions were placed upon the power of individuals to deal under such circumstances and conditions as, according to the conception of the times, created a presumption that the dealings were not simply the honest exertion of one's right to contract for his own benefit unaccompanied by a wrongful motive to injure others, but were the consequence of a contract or course of dealing of such a character as to give rise to the presumption of an intent to injure others through the means, for instance, of a monopolistic increase of prices.

*Standard Oil Co.*, 221 U.S. at 52, 31 S.Ct. at 512 (summarizing the common law related to monopolies); *see also id.* at 54 & 58, 31 S.Ct. at 513 & 515 (same). Congress made § 2 of the statute even broader than the common law. The common law prohibited acts that produced a monopoly, which then meant an undue restraint of trade; § 2 of the statute also prohibited any attempt to monopolize, even though the acts by which the attempt was made did not themselves produce a monopoly. *Id.* at 61, 31 S.Ct. at 516.

In passing antitrust legislation, Congress's purpose was not only an economic one, but was also a political one, a purpose of curbing the power some individuals and

---

made that a defendant who lowered prices to a predatory level intended to injure competition. From this inference of defendant's intent, a second inference, that the defendant did indeed injure competition, is then made. *Pacific Engineering & Production Co. v. Kerr–McGee Corp.*, 551 F.2d 790, 798 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

**25.** As amended December 21, 1974, Pub.L. 93–528 § 3, 88 Stat. 1708. For the legislative history of this amendment, *see* H.R.Rep. No. 1463, 93d Cong., 2d Sess. 1, *reprinted in* 1974 U.S.Code Cong. & Admin.News 6535, 6540.

**26.** "Although debates may not be used as a means for interpreting a statute (*United States v. Trans–Missouri Freight Association*, 166 U.S. [290] 318, [17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897)] and cases cited), that rule in the nature of things is not violated by resorting to debates as a means of ascertaining the environment at the time of the enactment of a particular law, that is, the history of the period when it was

adopted." *Standard Oil Co. v. United States*, 221 U.S. 1, 50, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1910).

**27.** The debates in 1890 show "that the main cause which led to the legislation was the thought that it was required by the economic conditions of the times, that is, the vast accumulation of wealth in the hands of corporations and individuals, ... and the widespread impression that their power had been and would be exerted to oppress individuals and injure the public generally." *Standard Oil Co. v. United States*, 221 U.S. 1, 50, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1910). As Justice Harlan expressed it, "the conviction was universal that the country was in real danger from another kind of slavery sought to be fastened on the American people, namely, the slavery that would result from aggregations of capital in the hands of a few individuals and corporations...." *Id.* at 83, 31 S.Ct. at 525 (Harlan, J., concurring and dissenting).

corporations had over the economy. *See* Letwin, 23 U.Chi.L.Rev. at 247–255; Pitofsky, *The Political Content of Antitrust,* 127 U.Pa.L.Rev. 1051, 1052 (1979); Sullivan, *Economics and More Humanistic Disciplines: What are the Sources of Wisdom for Antitrust?,* 125 U.Pa.L.Rev. 1214, 1222–23 (1977). As Senator Sherman himself explained, "[i]f we will not endure a king as a political power we should not endure a king over the production, transportation, and sale of any of the necessaries of life." 21 Cong.Rec. 2457 (1890).

Enacted in 1936, the Robinson–Patman Act strengthened the 1914 Clayton Act's prohibition of price discrimination. S.Rep. No. 1502, 74th Cong., 2d Sess. 3 (1936); H.R. No. 2287, 74th Cong., 2d Sess. 3, 16 (1936); *FTC v. Anheuser–Busch, Inc.,* 363 U.S. 536, 545, 80 S.Ct. 1267, 1272, 4 L.Ed.2d 1385 (1960). Section 2 of the Clayton Act, as originally enacted in 1914, provided as follows:

> That it shall be unlawful for any person ... to discriminate in price between different purchasers of commodities, ... where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: *Provided,* That nothing herein contained shall prevent ... discrimination in price in the same or different communities made in good faith to meet competition.

Clayton Act, ch. 323, § 2, 38 Stat. 730 (1914) (current version at 15 U.S.C. § 13 (1982)). The House Report stated that § 2 of the Clayton Act was

> expressly designed with the view of correcting and forbidding a common and widespread unfair trade practice whereby certain great corporations and also certain smaller concerns which seek to secure a monopoly in trade and commerce by aping the methods of the great corporations, have heretofore endeavored to destroy competition and render unprofitable the business of competitors by selling their goods, wares, and merchandise at a less price in the particular communities where their rivals are engaged in business than at other places throughout the country.... In the past it has

> been a most common practice of great and powerful combinations engaged in commerce—notably the Standard Oil Co., and the American Tobacco Co., and others of less notoriety, but of great influence—to lower prices of their commodities, oftentimes below the cost of production in certain communities and sections where they had competition, with the intent to destroy and make unprofitable the business of their competitors, and with the ultimate purpose in view of thereby acquiring a monopoly in the particular locality or section in which the discriminating price is made.

H.R.Rep. No. 2287, 74th Cong., 2d Sess. 8 (1914). In addition to the reasons for prohibiting price discrimination given by the House Report, the Senate Report added:

> Every concern that engages in this evil practice must of necessity recoup its losses in the particular communities where their commodities are sold below cost or without a fair profit by raising the price of the same class of commodities above their fair market value in other sections or communities.

S.Rep. No. 698, 63d Cong., 2d Sess. 3 (1914). This legislative history makes plain that § 2 of the Clayton Act "was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers." *FTC v. Anheuser–Busch, Inc.,* 363 U.S. 536, 543, 80 S.Ct. 1267, 1271, 4 L.Ed.2d 1385 (1959).

In relevant part, the Clayton Act today, as amended by the Robinson–Patman Act, provides that

> [i]t shall be unlawful for any person ... to discriminate between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition ...: *Provided,* That nothing herein contained shall prevent differentials which make only due allowances in the cost of manufacture, sale, or delivery resulting from

the different methods or quantities in which such commodities are to be sold or delivered.

15 U.S.C. § 13(a). The 1936 Robinson–Patman amendments to the Clayton Act, among other things, strengthened the prohibitions against price discrimination by changing the exceptions carved from the general rule (the exceptions are the parts of the statute following *"Provided"*). As the Senate Judiciary Committee explained,

> [t]he weakness of present section 2 lies principally in the fact that: (1) It places no limit upon differentials permissible on account of differences in quantity; and (2) it permits discriminations to meet competition, and thus tends to substitute the remedies of retaliation for those of law, with destructive consequences to the central object of the bill. Liberty to meet competition which can be met only by price cuts at the expense of customers elsewhere, is in its unmasked effect the liberty to destroy competition by selling locally below cost, a weapon progressively the more destructive in the hands of the more powerful, and most deadly to the competitor of limited resources, whatever his merit and efficiency. While the bill as now reported closes these dangerous loopholes, it leaves the fields of competition' free and open to the most efficient, and thus in fact protects them the more securely against inundations of mere power and size.

S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936).

■ The Senate Report also explained that the amended statute's cost exception to the general rule

> limits the differences in cost which may be honored in support of price differentials, to those marginal differences demonstrable as between the particular customers concerned in the discrimination. It is designed, among other things, to preclude the grant of a discrimination to a particular customer equal to the whole saving in cost resulting to the seller's entire volume of business as augmented by that customer's patronage; to preclude also differentials based on allocated or imputed, as distinguished from actual, differences in cost, representing particular facilities or departments which the favored customer may not have immediately utilized, but with which the seller cannot dispense in the general conduct of his business.

*Id.* at 5–6.[28] Translated into the language of economists such as Areeda and Turner, this part of the legislative history makes clear that Congress intended to limit the cost exception to differences in expenses particular to a customer, such as transportation savings, but did not intend to include within the exception sales above average variable cost even by a seller with excess capacity, who could produce additional goods without increasing fixed costs. *See also* H.R.Rep. No. 2287, 74th Cong., 2d Sess. 17 (giving other examples of economies of scale that result in lower costs and could lead to lower prices without violating the Act).

■ In explaining the practices to be prohibited by the Act, the House Judiciary Committee in the House Conference Report expressed a similar concern with limiting price differences to those specific to a particular customer:

> Discriminations in excess of sound economic differences between the customers concerned, in the treatment accorded them, involve generally an element of loss, whether only of the necessary minimum of profits or of actual costs, that must be recouped from the business of customers not granted them.

*Id.* at 8; *see also* S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936) (using similar language). Therefore, differences in price, even if the lower price is only too low to provide the seller any profit, are prohibited

---

**28.** The version of this provision proposed by the Senate Judiciary Committee in 1936 differs slightly from the enacted statute in effect today, but the differences are immaterial to the present discussion. In addition, Congress illustrated this principle with an example based on injury to a buyer, but the phrase being explained applies equally to a seller's Robinson–Patman Act claim.

unless the difference is justified by differences between the customers.

In summary, Congress's exact intent when enacting the antitrust statutes as to what conduct established an antitrust violation is beyond the reach of human knowledge, but the statutes, their legislative histories, and common sense indicate that Congress intended for subjective evidence of a defendant's intent to be relevant. Predatory pricing provides only objective, circumstantial evidence of predatory intent. In determining how Congress intended proof to be made of antitrust violations, common sense suggests that objective, circumstantial evidence of prices and costs and direct and circumstantial evidence of subjective intent would both be important.[29] *Cf. Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (direct or circumstantial evidence may prove antitrust conspiracy). Furthermore, the Sherman Act being a criminal statute codifying and expanding the common law, and proof of its violation requiring a showing of specific intent, in addition to the legislative background of public outcry in 1890 against monopolies, Congressional concern with the economic and political power of large combinations and with restraining harmful but not all competition, and the distinction discussed in 1936 between differences in prices due to differences in costs related to a particular customer and to differences in price due to excess capacity, all make ignoring a defendant's subjective intent unsupportable.

The antitrust statutes and their legislative histories also indicate that Congress intended average total cost to be the objective standard used. The predatory pricing test requires a cost standard below which it may be inferred that a defendant violated the antitrust statutes. The Sherman Act and its legislative history do not offer guidance as to what measure of cost is relevant, except indicating that, as a codification of the common law, Sherman Act violations could be proven in part through objective evidence. The legislative histories of both the Clayton Act and the Robinson–Patman Act, on the other hand, both offer specific guidance. The Robinson–Patman Act itself uses the word "cost," which should be interpreted as meaning all costs.[30] Moreover, the legislative history specifically explains that a seller cannot sell at average variable cost, without covering any fixed costs, even if he has excess capacity. Furthermore, the Robinson–Patman Act's legislative history refers to "the necessary minimum of profits or of actual costs;" the Clayton Act's legislative history refers to "below cost or without a fair profit." In economic terms, the cost of capital, which can be understood as the expected profit necessary to induce investors to invest, are also costs.[31] Including the cost of capital, expressed by Congress as "a fair profit" and as "the necessary

**29.** When considering the role Congress foresaw for objective evidence, *i.e.,* economics, in proving an antitrust violation, one must remember Congress did not have the advantage of the plethora of academic writings now available on the subject. The development of economic theory as applied to antitrust law is not to be ignored—in fact, courts should use it vigorously in furthering the Congressional intent of using objective evidence of prices and costs. On the other hand, an original Congressional intent of using evidence of a defendant's subjective intent is not to be ignored today just because the science (art?) of economics has made great strides since original passage of the statutes. Economics provides the means for evaluating the facts, not the elements of an antitrust violation.

**30.** "[L]egislation when not expressed in technical terms is addressed to the common run of

men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).

**31.** "A fair profit" or "the necessary minimum of profits" may reflect an implicit or explicit cost, depending on how a company is capitalized. *See* E. Mansfield, *Microeconomics: Theory and Application* 181 (4th ed. 1982) (defining implicit and explicit costs). Regardless of whether it reflects an implicit or explicit cost, it still should be considered a cost of production under the alternative cost doctrine (also known as the opportunity cost doctrine). *See id.* at 179 (defining and discussing the alternative cost doctrine).

minimum profit," indicates Congress intended all costs to be part of the standard.

### 2. *Supreme Court Precedent*

Three recent Supreme Court cases shed light on interpreting these antitrust statutes. Although these cases do not directly address the issues in this case, they suggest the proper definition of cost and the role of subjective evidence and costs in summary procedure in antitrust cases.

In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court held that a private plaintiff seeking injunctive relief under 15 U.S.C. § 16 must show a threat of antitrust injury, which means threat of an injury for which a plaintiff could eventually claim treble damages. In *Cargill*, the Court reversed the Tenth Circuit because the plaintiff did not show at the trial more than a threat of loss or damage due merely to increased competition and neither raised nor proved any claim of predatory pricing before the district court. In discussing predatory pricing, the Court first defined the term: "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competition in the short run and reducing competition in the long run." *Id.* 107 S.Ct. at 493. The Court recognized the debate among the Circuit Courts of Appeals and among academics concerning "measure of cost" but did not indicate what "measure of cost" or "cost" was appropriate. *Id.* at n. 12. The Court held that for the purposes of deciding *Cargill*, a definition of predatory pricing consistent with a definition of pricing below cost was sufficient,

> because only below-cost pricing would threaten to drive [plaintiff] from the market, see n. 9, *supra,* and because [plaintiff] made no allegation that [defendant] would act with predatory intent. Thus, in this case, as in *Matsushita Electric Indus. Co. v. Zenith Radio Corp., supra,* we find it unnecessary to "consider whether recovery should *ever* be available ... when the pricing in question is

above some measure of incremental cost." [sic] 475 U.S. at 585, n. 9, 106 S.Ct. at 1355, n. 9, or whether above-cost pricing coupled with predatory intent is ever sufficient to state a claim of predation. See n. 11, *supra.*

*Id.* The Court concluded that the plaintiff did not prove any claim of predatory pricing because the evidence "consist[ed] only of four passing references, three in deposition testimony, to the possibility that [defendant's] prices might dip below costs." *Id.* at 494. The Court also commented that other factors, such as the defendant's market share capacity and the barriers to entry after competitors have been driven from the market, must also be considered, because these factors indicate whether an illegal predator is capable of successfully pursuing a predatory scheme. *Id.* at n. 15. The Court warned that "[c]ourts should not find allegations of predatory pricing credible when the alleged predator is incapable of successfully pursuing a predatory scheme. *See infra,* n. 17." *Id.*[32]

In *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357 (1986), the Supreme Court held that a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. As in *Cargill*, the Court in *Matsushita* recognized the debate concerning what "cost" is relevant in a predatory pricing claim, but did not take sides in the debate. 106 S.Ct. at 1355 nn. 8 & 9. In *Matsushita*, rather than supporting a theory of conspiratorial predatory pricing injuring the plaintiffs, the evidence of conspiracy indicated a conspiracy that "actually tended to benefit" plaintiffs. *Id.* at 1356. The Court stated that "if the factual context renders [plaintiffs] claim implausible—if the claim is one that simply makes no economic sense— [plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.*

---

**32.** The note referred to by the Supreme Court discusses *Matsushita* and emphasizes the care a court must use in evaluating a predatory pricing claim.

The Court noted that in single firm cases, much less conspiracy cases,

> the likelihood that predatory pricing will benefit the predator is "inherently uncertain: the short run loss [from pricing below cost] is definite, but the long-run gain depends on successfully neutralizing the competition.... [and] on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." 475 U.S. at 588, 106 S.Ct. at 1357.

*Cargill*, 107 S.Ct. at 495 n. 17 (quoting *Matsushita*). Accordingly, the Court rejected the Court of Appeals' theory of conspiracy as making no practical sense.

In *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), the evidence at the trial below showed that defendants, three large national companies, for over three years sold frozen pies in the Salt Lake City marketing area at prices below their cost and below their prices in other markets that were closer to their plants. The Court held this evidence was sufficient to support a finding of injury to competition despite the increasing sales volume of plaintiff, a local company, and the fact that plaintiff continued to make a profit. *Id.* at 702–03, 87 S.Ct. at 1336. The Court's opinion dealt with the conduct of each defendant separately, concluding that "there was some evidence of predatory intent with respect to each of these [defendants]." *Utah Pie*, 386 U.S. at 702, 87 S.Ct. at 1336. The Court said the first defendant "suffered substantial losses on its frozen pie sales," *id.* at 697, 87 S.Ct. at 1333, the second defendant had a price in Salt Lake City that "was less than its direct cost plus an allocation for overhead," [33] *id.* at 698, 87 S.Ct. at 1334, and the third defendant had prices that were "admittedly well below its costs," *id.* at 701, 87 S.Ct. at 1335. In addition, as to the first defendant, the Court held that the jury could rely on statements by the first defendant's management that plaintiff was "an unfavorable factor" that "d[u]g holes in our operation" in concluding that the

first defendant's discriminatory pricing was aimed at injuring plaintiff. *Id.* at 696–97, 87 S.Ct. at 1332–33. Relying on this evidence to show predatory intent, the Court then relied on this predatory intent to show injury to competition. *Id. See generally* E. Kintner & J. Bauer, 3 *Federal Antitrust Law* § 22.8 at 285 & nn. 165 & 166 (1983).

In summary, the recent Supreme Court cases are consistent with the conclusions drawn from the survey above of the antitrust statutes and their legislative histories. *Utah Pie* bears most directly on the primary issues in the case at bar—whether subjective evidence is to be used and what cost standard is to be used. In *Utah Pie*, the Court used evidence of subjective intent in concluding a defendant had the requisite intent. The Court did not decide what cost standard should be used in the predatory pricing test, but held that the relevant cost could be "direct cost plus an allocation for overhead," which is inconsistent with Areeda and Turner's proposed average variable cost test. *Matsushita* and *Cargill* recognize the debate over the appropriate measure of cost, but in both cases the Supreme Court declined to define an appropriate standard. In *Cargill*, the Court considered objective evidence other than prices and costs, which does not necessarily support the use of subjective evidence, but is inconsistent with Areeda and Turner's predatory pricing test used by the district court, which relies solely on objective evidence of prices and costs.

C. The Eleventh Circuit Test for Predatory Pricing.

Determining that subjective evidence and average total cost are relevant does not end the matter. The Eleventh Circuit test for predatory pricing must still be spelled out. As given below, the Eleventh Circuit test borrows from the tests used by a majority of our sister circuits and relies on the cases cited in the notes as in accord with our test for an explanation of the test's origins.

---

**33.** Overhead is a fixed cost. P. Samuelson, *Economics* 466 (10th ed. 1976). Therefore, in *Utah*

*Pie* the Supreme Court understood cost to be more than average variable cost.

■ If a defendant's prices were above average total cost then there is no predatory pricing and thus no circumstantial evidence of predatory intent.[34] Average total cost means the average of the total economic cost, which includes the necessary minimum profit.[35] Average total cost should theoretically be measured by long run marginal cost, but in appropriate cases a surrogate for total cost may be used.[36]

■ If a defendant's prices were below average total cost and above short run marginal cost, then there is circumstantial evidence of predatory intent. An inference of predatory intent, however, may not rest solely on prices of this nature. To withstand judgment as a matter of law, a plaintiff must have other evidence, either objective or subjective, of predatory intent.[37] *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (antitrust plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct). The closer a defendant's price is to average total cost, the stronger this other evidence must be for the plaintiff still to avoid summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[t]he moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). As

---

**34.** *Accord Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir.1987); *Arthur S. Langenderfer, Inc. v. S. E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 511, 83 L.Ed.2d 401 (1984); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983); *MCI Communications v. AT & T*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *contra Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir.) (allowing a plaintiff to prove by clear and convincing evidence that a defendant's prices above total cost were predatory), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

**35.** The amount of profit that is a part of total economic cost is an issue of fact requiring expert testimony particular to the market involved.

**36.** Two cases have turned, in part at least, on the choice between long run marginal cost and fully distributed cost as the appropriate measure of total cost. *Southern Pacific Communications Co. v. AT & T*, 740 F.2d 980, 1005–07 (D.C.Cir. 1984) (expressing doubt about the usefulness of fully distributed costs as a measure of costs in predatory pricing cases), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *MCI Communications v. AT & T*, 708 F.2d 1081, 1114–23 (7th Cir.) (holding that long run marginal cost, not fully distributed cost, is the appropriate measure of total cost), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *see also Northeastern Telephone Co. v. AT & T*, 651 F.2d 76, 86–91 (2d Cir.1981) (holding short run marginal cost and its surrogate average variable cost, not fully distributed cost, is the appropriate measure of cost), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Long run marginal cost is an economic concept, which makes it preferable, while fully distributed cost is a specialized accounting concept. The relationship between fully distributed cost and long run marginal cost is similar to the relationship between average variable cost and short run marginal cost.

**37.** *Accord Instructional Systems Development Corp. v. Aetna Casualty & Surety Co.*, 817 F.2d 639 (10th Cir.1987); *Henry v. Chloride*, 809 F.2d 1334 (8th Cir.1987); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 432 (7th Cir.1980); R. Posner, *Antitrust Law, An Economic Perspective* 188–193 (1976); *contra Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884 (5th Cir. 1984) (in the general case, prices above average variable cost conclusively presumed non-predatory), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76 (2d Cir.1981) (same), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

The Ninth and Sixth Circuits' cases above hold that prices above average variable cost are "rebuttably presumed" to be nonpredatory. Because the burden of proof on this issue is already on plaintiff, the effect is only to require evidence in addition to prices above average variable cost before a fact finder may infer predatory intent and to add verbiage that may confuse a jury. Therefore, we do not use the same language as the Ninth and Sixth Circuits, but the difference for those prices (below average total cost and above short run marginal cost) is one of semantics and not of substance.

suggested by Areeda and Turner, average variable cost may usually be used as a surrogate for short run marginal cost.[38]

■■■■ If a defendant's prices were below short run marginal cost, then the circumstantial evidence is strong enough to create a rebuttable presumption of predatory intent.[39] *See Matsushita*, 106 S.Ct. at 1357 (antitrust plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct); *Standard Oil Co. v. United States*, 221 U.S. 1, 52, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1910) (summarizing the common law, from which the Sherman Act borrowed, as recognizing presumptions created by objective evidence); *cf.* Fed.R.Evid. 301 (presumptions in general in civil actions). If a defendant's prices were below short run marginal cost and the other evidence, subjective or objective, is sufficiently probative of defendant's predatory intent, then as a matter of law defendant has the predatory intent required to establish the attempt to monopolize element of a Sherman Act claim and to establish the injury to competition element of a Robinson–Patman Act claim. *International Air Industries v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Again, average variable cost may be used as a surrogate for short run marginal cost.

## IV. McGAHEE'S SHERMAN ACT CLAIM

■■■■ In McGahee's Sherman Act claim, he must show that Northern Propane intended to achieve a monopoly and that there was a dangerous probability Northern Propane would succeed. In granting summary judgment, the district court held that McGahee could not prove predatory pricing, which is the theory McGahee relies upon to establish the intent element.[40] *McGahee*, 658 F. Supp. at 192–96. Under the Eleventh Circuit test for predatory pricing, McGahee has presented evidence from which a fact finder could infer predatory intent. First, Northern Propane does not argue that its prices were above average total cost. Second, McGahee points to three items of evidence that are more than sufficient to create a factual issue as to predatory intent for sales at prices below average total cost and above average variable cost: (1) Northern Propane's investigation of McGahee's financial position, (2) Northern Propane's new policy of rent-free tanks designed to take advantage of McGahee's weak financial position, and (3) Northern Propane's internal memorandum declaring "contribute to Floyd's financial problems" to be a goal for Northern Propane's local office. Third, McGahee has pointed to evidence that, on the record before us, could show that Northern Propane sold propane at prices below its average variable cost.[41] Therefore, McGahee has presented evidence that creates a genuine issue of fact as to whether Northern

**38.** When average variable cost is appropriate to use, as well as determining what costs are variable, is an issue of fact requiring expert testimony.

**39.** *Accord Henry v. Chloride*, 809 F.2d 1334 (8th Cir.1987); *Indian Coffee Corp. v. Proctor & Gamble Co.*, 752 F.2d 891 (3d Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *but see Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884 (5th Cir. 1984) (prices below average variable cost conclusively establish plaintiff's prima facie case), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83

L.Ed.2d 924 (1984); *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76, 91 n. 24 (2d Cir.1981) (same), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

**40.** We are not required in this case to decide what an antitrust plaintiff relying on a theory other than predatory pricing must show to establish the intent element of an attempt to monopolize claim.

**41.** Reducing the price to particular customers, as the evidence discussed *supra* nn. 5 & 6 suggests Northern Propane did, is sufficient to create a jury issue. *C.E. Services, Inc. v. Control Data Corp.*, 759 F.2d 1241, 1247 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985).

Propane had the intent necessary for an attempt to monopolize claim.

■ The district court also alternatively held that McGahee cannot prove the second element of an attempted monopolization claim. The court stated that it found no evidence that a predatory pricing scheme had a dangerous probability of success, basing this statement on defendant's inability to charge supracompetitive prices,[42] plaintiff's increasing market share,[43] and the market's low entry barriers.[44] *McGahee*, 658 F.Supp. at 196–97. Although the factors the district court discussed are relevant, proving a dangerous probability of success in achieving a monopoly requires proof of the defendant's market power. *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 242–43 (5th Cir. 1978); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 266 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); 3 Von Kalinowski, *Anti–Trust Trade Law & Trade Regulations* § 9.01[2][a] (1988).

■ When determining whether an issue of fact exists as to whether defendant's actions presented a dangerous probability of defendant achieving a monopolist's market power, a court examines the relevant market and defendant's market power before the attempt to monopolize began. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965) (dicta); *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 982 (5th Cir. 1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308

F.2d 383, 390 (5th Cir.1962) (failure to determine defendant's market share warranted withdrawal of charge from jury), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed. 2d 717 (1963); *e.g.*, *Quality Foods v. Latin American Business Development Corp.*, 711 F.2d 989, 996 (11th Cir.1983); *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119–21 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986) (emphasizing importance of market share in predatory pricing case); *but see Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir.1980) (market power only a factor to consider when determining whether defendant had the specific intent to monopolize), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

■ Determining whether a defendant possesses sufficient market power to be dangerously close to achieving a monopoly requires analysis and proof of the same character, but not the same quantum, as would be necessary to establish monopoly power for an actual monopolization claim. *See generally* 3 Von Kalinowski: *Antitrust Laws & Trade Regulation* § 9.01[2][a] (1988); L. Sullivan, *Antitrust* 137 (1977). The best test from which market power may be inferred is relative size, *i.e.*, the percentage of market share. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The market share necessary for a defendant to be capable of posing a threat of achieving monopoly power depends on the type of factors concerning Northern Propane and McGahee discussed by the district court. *McGahee*, 658 F.Supp. at

---

**42.** Although the record does not indicate supracompetitive prices in the Camilla district, about 20 percent of Northern Propane's districts had "operating rates of return" of 18 percent or higher. Affidavit of Ronald E. Ingram. Among other things, these high rates of return suggest that a retail propane distributor can earn supracompetitive profits.

**43.** *But see Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 992–93 (5th Cir.1983) (dangerous probability not negated by defendant's market share decrease from over 80 percent to 38 percent and plaintiff's market share increase from zero percent to 60 percent), *cert. denied*, 465

U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *cf. Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 689, 87 S.Ct. 1326, 1329, 18 L.Ed.2d 406 (1967) (upholding jury verdict in Patman–Robinson case despite plaintiff's steadily increasing sales volume).

**44.** *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119–21 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986) (emphasizing importance of entry barriers in predatory pricing case); *but see supra* n. 11 (suggesting whether barriers to entry are high in this case is a question of fact).

196–97. *Cf. United States v. Columbia Steel Co.*, 334 U.S. 495, 528, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) ("the relative effect of percentage command of a market varies with the setting in which that factor is placed") (actual monopolization case); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir.1976) (upholding finding of fact in nonjury case that retail propane distributor with 50 percent market share did not present dangerous probability of success), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

█ In this case, it is "undisputed" [45] that Northern Propane had sixty or sixty-five percent of the relevant market when the alleged predatory pricing began. Without examining any factors to determine what market share would be necessary for Northern Propane's alleged predatory pricing to present a dangerous probability of success, we can say that a sixty or sixty-five percent market share is a sufficiently large platform from which such a scheme could be launched to create a genuine issue of material fact as to whether there was a dangerous probability that Northern Propane would succeed in achieving a monopoly. *Cf. American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) ("over two-thirds of the entire field of cigarettes, and ... over 80 percent of the field of comparable cigarettes" held to constitute "a substantial monopoly"); *Kelco Disposal v. Browning–Ferris Industries*, 845 F.2d 404, 409 (2d Cir.1988) (market share above fifty-five percent sufficient, along with other market characteristics, to establish dangerous probability of success); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982) (decline from forty percent to thirty percent insufficient to establish defendant's "capacity to monopolize"); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n. 2 (5th Cir.1969) (fifty percent market share may be sufficient to establish monopoly power).

## V. McGAHEE'S ROBINSON–PATMAN ACT CLAIM

█ In McGahee's Robinson–Patman Act claim, he must show that Northern Propane, in the course of interstate commerce, discriminated in price between different purchasers and a reasonable possibility that this price difference may harm competition. The district court held that McGahee's Robinson–Patman Act claim failed because McGahee could not establish predatory pricing.[46] *McGahee*, 658 F.Supp. at 197. Proof of predatory pricing can satisfy the second element, harm to competition, in a Robinson–Patman claim brought against a competing seller.[47] *Utah Pie Co.*

**45.** In McGahee's brief, he relies on statements in affidavits by competitors on the fringe of the relevant geographic market and on conclusory statements of an expert, whose analysis focused on the proper test for predatory pricing, to establish the dangerous probability of success element. Northern Propane responds by attacking these sources of evidence and by pointing out that it is "undisputed" that Northern Propane's market share declined from 65 percent in 1981 to 35 percent in 1983. Therefore, we assume, arguendo, that Northern Propane's market share when McGahee opened for business was 65 percent. *See also supra* n. 4.

**46.** The district court did not discuss, but the parties have argued about, price discrimination and interstate commerce. The record indicates that there is an issue of fact as to whether Northern Propane practiced price discrimination. *See supra* n. 6. In addition, the Supreme Court has held that sales similar to Northern Propane's sales as described in McGahee's deposition were interstate sales within the meaning of the Robinson–Patman Act. *Standard Oil Co.*

*v. FTC*, 340 U.S. 231, 236–38, 71 S.Ct. 240, 243–44, 95 L.Ed. 239 (1951); *see also Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954).

**47.** The reasonable possibility of harm to competition can be shown in two ways: "either directly by market analysis showing injury to competition, or by inference from injury to the plaintiff-competitor accompanied by defendant's predatory intent, the logic for the latter method being that 'an illicit intent accentuates the probability that a prohibited consequence will come to pass.'" *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1344 (8th Cir.1987) (quoting F. Rowe, *Price Discrimination Under the Robinson Patman Act*, 44 (1962)). Because of our holding concerning predatory pricing, we do not reach the issue of whether McGahee could prove injury to competition through market analysis. *See generally* 4 Van Kalinowski, *Antitrust Laws & Trade Regulation* §§ 29.02 & 29.03 (1988); E. Kintner & J. Bauer, 3 *Federal Antitrust Law* §§ 22.8 & 22.9 (1983).

*v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). As already explained in relation to McGahee's Sherman Act claim, McGahee has presented evidence of predatory prices from which a fact finder could infer predatory intent. Therefore, whether Northern Propane's alleged discriminatory pricing caused injury to competition presents genuine issues of material fact.

## VI. CONCLUSION

Accordingly, the summary judgment granted by the district court is reversed. The case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.