**U.S. ANCHOR MANUFACTURING, INC., Plaintiff,**

v.

**RULE INDUSTRIES, INC. and Tie Down, Inc., a/k/a Tie Down Engineering, Inc., Defendants,**

v.

**William CHAPMAN and U.S. Anchor Manufacturing, Inc., Defendants in Counterclaim.**

Civ. A. No. 86–CV–2447–JTC.

United States District Court, N.D. Georgia, Atlanta Division.

June 27, 1989.

James Alexander Porter, Porter & Doster, Atlanta, Ga., for plaintiff.

John A. Chandler, Kimberly Logue Woodland, Sutherland Asbill & Brennan, Atlanta, Ga., for defendant Rule Industries, Inc.

Harold Turner Daniel, Jr., Laurie Webb Daniel, Webb & Daniel, Atlanta, Ga., for Tie Down, Inc.

## ORDER OF COURT

CAMP, District Judge.

This matter is before the Court on defendant Tie Down, Inc.'s Motion for Summary Judgment; defendant Rule Industries, Inc.'s Motion for Summary Judgment and the motion of William Chapman and U.S. Anchor for Summary Judgment. For the following reasons, the above motions for summary judgment are DENIED. Defendant Tie Down's motion to file a supplemental brief and an amendment to this motion is GRANTED.

This is an action for treble damages and injunctive relief for alleged antitrust violations under Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act. Plaintiff also alleges that defendants' actions constitute an unfair restraint of trade in violation of Article 3, Section VI, Paragraph V of the Georgia Constitution and O.C.G.A. § 13-8-2. Defendants seek summary judgment on all of plaintiff's theories for relief. Defendant Tie Down, Inc., a/k/a Tie Down Engineering, Inc. ("Tie Down") brings a counterclaim against plaintiff U.S. Anchor Manufacturing, Inc. ("U.S. Anchor") and William Chapman. This counterclaim alleges a breach of fiduciary duty; misappropriation of confidential business information; tortious interference with business relations; and common law fraud and deceit. U.S. Anchor and William Chapman seek summary judgment on Tie Down's theories for relief in its counterclaim.

## I. FACTS

The present action involves several manufacturers and suppliers of fluke anchors. Anchors and other marine industry products are generally sold by suppliers to wholesale distributors, who in turn sell the anchors to boat dealers, marinas, and other retailers for ultimate resale to the consumer, the boat owner. The supplier may either manufacture its own anchors, as does U.S. Anchor, or purchase them from another domestic manufacturer, as Rule Industries, Inc. ("Rule") does from Tie Down, or import them from abroad.

In 1974, defendant Tie Down decided to expand its business of manufacturing anchoring mechanisms for mobile homes into the marine anchor business. Tie Down thus began manufacturing and selling inexpensive "generic" anchors under the "Hooker" tradename. These anchors were among the earliest generic fluke style an-

chors. In 1974, Tie Down expanded its Hooker line of anchors to include a fluke style anchor called the Danforth. Tie Down inexpensively duplicated the Danforth anchor, whose patent had expired, and sold it cheaply under the Super Hooker tradename.

Defendant Rule entered the recreational marine anchor business in 1983 when it acquired the Danforth line of anchors from the Eastern Company. In May 1985, Rule agreed to acquire Tie Down's marine anchor division, including its anchor inventory, certain machinery and equipment used in the manufacture of marine anchors, and a license to exclusive use of Tie Down's marine anchor trade names ("Hooker", "Super Hooker", and "Hugger") for seven years. In addition, Tie Down agreed not to sell anchors in competition with Rule for at least five years. Tie Down maintains that it negotiated this manufacturing agreement to recoup losses it suffered at this time.

Plaintiff U.S. Anchor was organized by William Chapman, Tie Down's former President, in the Spring of 1985 to compete with Rule and Tie Down in the sale of inexpensive generic anchors. William Chapman was employed by Tie Down in January, 1979, and appointed President in July, 1984. Chapman maintains that he resigned in January, 1985, as President of Tie Down because of disagreements with Tie Down's owner, Chuck MacKarvich, over the proper methods of running the company and Chapman's lack of managerial authority. Chapman maintains that he did not contemplate starting a marine anchor company until after his January resignation, at which time, he generally advised MacKarvich that he might end up in some form of competition with Tie Down. Chapman maintains that it was not until April, 1985, when Tie Down entered into an agreement to sell its marine anchor division to Rule Industries, that he saw an opportunity to start a marine anchor company.

Defendant Tie Down, however, contends that Chapman actively prepared to go into business in competition with Tie Down while still serving as President of Tie Down. Tie Down alleges that in early 1985, while still employed by Tie Down, Chapman used Tie Down's resources, personnel and confidential business information to set up his competing business, U.S. Anchor. These allegations form the basis of Tie Down's counterclaim. MacKarvich testified that when he fired Chapman in late April, 1985, for making disparaging remarks about Tie Down, he did not know of Chapman's plans to compete in the marine anchor business.

Plaintiff now alleges that defendants have conspired to engage in, and have engaged in, predatory pricing and unlawful tying arrangements to eliminate plaintiff as a competitor and to achieve a monopoly in the relevant product market. Plaintiff maintains that it originally intended to set its prices at 10–12% below that of the previous season's prices; however, these prices never went into effect because Rule immediately reduced its prices by 15% to undercut plaintiff's pricing. Plaintiff then maintains that it cut its prices and, in response, Rule lowered its prices by an additional 20%. Rule, however, argues that its price reductions were in response to the influx of cheaper anchors by foreign competitors.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of his claim. Thus, the movant's burden is easily "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Once the movant has met this burden, the opposing party must then present evidence establishing a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demon-

strate that a genuine issue of material fact does exist. *Id.* The Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), "that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."

■ "[S]ummary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition." *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989), *citing, Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986). Thus, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was consistent with permissible competition as with illegal conduct. *Id.*

### III. SHERMAN ACT CLAIMS

Plaintiff alleges a claim for attempted monopolization pursuant to § 2 of the Sherman Act; conspiracy and combination to monopolize pursuant to § 2 of the Sherman Act; and conspiracy to eliminate competitors in violation of § 1 of the Sherman Act. *See* 15 U.S.C. §§ 1, 2.

■ A § 1 Sherman Act claim for conspiracy to eliminate a competitor requires (1) an agreement to engage in anticompetitive conduct and (2) an adverse impact on the relevant market as an "unreasonable restraint of trade". *Hill Aircraft & Leasing Corporation v. Fulton County*, 561 F.Supp. 667, 676 (N.D.Ga.1982), *aff'd*, 729 F.2d 1467 (11th Cir.1984).

■ To sustain a § 2 Sherman Act claim of attempted monopoly, a plaintiff must show: (1) the relevant product and geographic markets; (2) that the defendant had the specific intent to gain a monopoly

position in the market; and (3) that there was a dangerous probability of *de facto* monopolization. *See American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Bill Beasely Farms, Inc. v. Hubbard Farms*, 695 F.2d 1341, 1342 (11th Cir.1983); *Photovest Corporation v. Fotomat Corporation*, 606 F.2d 704, 711–21 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). A § 2 claim for combination or conspiracy to monopolize requires proof of the same elements involved in an attempt claim with the exception that it is not necessary to show that the scheme to monopolize was ever "attempted to any harmful extent." *American Tobacco Co.*, 328 U.S. at 811, 66 S.Ct. at 1139.

■ All of plaintiff's Sherman Act claims require defendant's intent to engage in anticompetitive conduct. Proof of predatory pricing can satisfy this element of intent for all three of plaintiff's Sherman Act claims. *Cargill v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986); *McGahee* 858 F.2d at 1493. To establish a claim for predatory pricing, the plaintiff may show (1) that the defendants sold their product below the average total cost of its production; and (2) that because of such pricing, the defendants had a dangerous probability of success on their Sherman Act claims. *McGahee*, 858 F.2d at 1493.

### A. The Areeda–Turner Average Variable Cost and The Eleventh's Circuit's Test of Average Total Cost

The Eleventh Circuit has recently rejected the test of Professors Areeda and Turner for determining predatory pricing claims. *See McGahee*, 858 F.2d at 1487, *citing*, Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 733 (1975). In the past, binding authority[1] required that courts in this Circuit apply the Areeda & Turner test, and thus subjective intent was irrelevant. Instead, intent to engage in anticompetitive conduct through predatory pricing was determined through comparison between prices and av-

---

**1.** *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (decisions rendered by the for-

mer Fifth Circuit before October 1, 1981, are binding upon courts of the Eleventh Circuit).

erage variable cost. *See International Air Industries v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The average variable cost of production is "the costs associated with producing each individual unit of output" ... "which do vary with production and roughly equal the cost of the resources necessary to produce additional units of output." *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 889 (5th Cir. 1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985).

▬ The Eleventh Circuit, however, has recently held that circumstantial evidence of subjective intent to predatorily price for the purposes of monopolization is also relevant in determining antitrust injury. *McGahee,* 858 F.2d at 1487. The Eleventh Circuit also now determines predatory pricing by examining the "full" or "total" costs, the "average total costs." Average total cost is the sum of average variable cost and average fixed cost, and equates to the total economic cost of selling and delivering a product. *McGahee,* 858 F.2d at 1496, n. 22. To constitute a meaningful economic concept, total economic cost must also include a necessary minimum profit. *Id.* at 1503.

The Eleventh Circuit three-part test that uses average total cost to infer predatory pricing is as follows:

(1) "If a defendant's prices were above average total cost then there is no predatory pricing and thus no circumstantial evidence of predatory intent. Average total cost means the average of the total economic cost, which includes the necessary minimum profit. Average total cost should theoretically be measured by long run marginal cost, but in appropriate cases a surrogate for total cost may be used."

(2) "If a defendant's prices were below average total cost and above short run marginal cost, then there is circumstantial evidence of predatory intent.... To withstand judgment as a matter of law, a plaintiff must have other evidence, either objective or subjective of predatory intent."

(3) "If a defendant's prices were below short run marginal cost, then the circumstantial evidence is strong enough to create a rebuttable presumption of predatory intent.... If a defendant's prices were below short run marginal cost and the other evidence, subjective or objective, is sufficiently probative of defendant's predatory intent, then as a matter of law defendant has the predatory intent required to establish the attempt to monopolize element of a Sherman Act claim...."

*McGahee,* 858 F.2d at 1503–04.

As to parts (2) and (3) of this test, "average variable cost" may be used as a surrogate for short run marginal costs. *Id.* at 1504.

Applying this test, the Eleventh Circuit found that McGahee had presented sufficient evidence to create an issue of fact as to whether Northern Propane had the intent necessary for an attempt to monopolize claim. *Id.* at pp. 1504–05. The defendant did not maintain that its sales were above its average total cost during price wars. *Id.* at 1505. The defendant's own documents indicated that in some months it sold propane to commercial customers at prices below average variable cost. *Id.* at 1492, 1495, n. 12. Circumstantial evidence of predatory intent included the defendant's (1) investigation of McGahee's financial position; (2) its new policy of rent-free tanks designed to take advantage of McGahee's weak financial position; (3) its internal memoranda declaring a goal of contributing to McGahee's financial problems; and (4) its price reductions to particular customers. *Id.* at 1504, n. 41. This was sufficient evidence from which a fact finder could infer predatory intent.

▬ Plaintiff has presented evidence from which a fact finder could infer predatory intent under both the Areeda–Turner test and the Eleventh Circuit's test in *McGahee.*[2] An issue of fact exists as to

---

**2.** The court notes that the standard for cost analysis to determine predatory pricing changed from the Areeda–Turner average variable cost to average total cost, as announced in *McGahee*

while the motions for summary judgment were pending in this court. Therefore, the parties first submitted evidence in accordance with the

whether Rule sold certain anchor models below average variable cost. *See* Andrews First Affidavit ¶ 9; Moody Deposition, pp. 55–63, 99; Anastoes Affidavit, ¶ 4. A question of fact also exists as to whether defendant Tie Down was selling to Rule at prices below Tie Down's average variable costs on certain anchor models. *See* Andrews Affidavit, ¶ 6–9, Exhs B–D; Appendix I to Tie-Down's Brief in Support of Summary Judgment. The Eleventh Circuit specifically stated in *McGahee* that a district court must not resolve factual disputes by weighing conflicting evidence of average variable costs. *McGahee*, 858 F.2d at 1495, n. 12.

Under the less stringent test of *McGahee*, plaintiff has also presented enough evidence to withstand summary judgment on the issue of predatory intent. As seen, this test is based on sales below average total costs. *Id.* at 1503. Plaintiff has submitted a second affidavit of its expert, John Andrews, that analyzes defendants' pricing in relation to their average total costs. The second affidavit analyzes defendants' average total costs, which includes both variable costs and fixed costs as well as a reasonable profit or return on shareholder equity.[3] Dr. Andrews concluded that Rule consistently sold every single anchor model to its customers at prices that were less than Rule's average total cost for each model from December, 1985, through April, 1988.

■■■ In rebuttal, Tie–Down contends that Andrews' calculations for both average variable cost or average total costs are erroneous because he did not consider the quantity of units produced. Because the per unit cost varies with the quantity of units produced, a costing analysis that does not consider the quantity of units produced cannot provide an accurate average variable cost or average total cost computation.

Andrews' analysis of both the average variable costs under the Areeda–Turner test and under the Eleventh Circuit's average total costs test takes output into account. In calculating both average variable cost and average total cost, Andrews

arrived at the total costs of parts required for each anchor by examining the actual manufacturing invoices of the steel, galvanizing, slitting services, and related freight costs at varying points in time from Tie Down's steel and galvanizing vendors. Andrews Affidavit pp. 6–7, and Deposition, p. 38. From these invoices, Andrews determined the steel cost per part by multiplying the steel required to produce the part by the steel cost per pound. *See* Exhibits B—D to Andrews Deposition, filed March 6, 1989. Andrews obtained the figure for the steel cost per pound from weights from Tie Down's cost analyses. *See* Andrews Deposition, p. 27; Exh. 9; and Mackarvich Exh. 31. Therefore, Andrews took into account the output by determining from the actual invoices for raw materials the price of steel used per part, based on Tie Down's own figures.

Andrews followed a similar method for determining the amount of labor expended on each anchor part. *See* MacKarvich Exh. 31. By adding together these amounts, Andrews then came up with the total cost of parts for each anchor. To this amount, Andrews added the cost of direct labor to weld the anchor parts together and the galvanizing cost. Andrews also determined the cost of this direct labor from Tie Down's internal numbers. Andrews Affidavit ¶ 7; Andrews Deposition, p. 41. He then calculated the cost of galvanizing, slitting services, and related freight costs at varying points in time from a review of all actual invoices from Tie Down's steel and galvanizing vendors. Andrews Affidavit ¶ 7 and Deposition p. 38. While defendants may contest the evidence upon which these calculation are based, this manner of calculation considers Tie Down's actual output.

To this total cost for material and direct labor, Andrews then added a variable overhead cost factor which was derived from the financial statements, trial balances, and work papers prepared by Tie Down's independent accounting firm. *Id.;* Affidavit ¶ 7; and Deposition pp. 41–44. Defen-

---

average variable cost. The parties have subsequently presently evidence in accordance with the average total cost standard.

**3.** Andrews' first affidavit analyzed average variable costs, which excluded any consideration of indirect or fixed costs or of any profit margin.

dant's have not contested the computation of this variable overhead cost calculation.

Defendants also maintain that Andrews' calculations for average total cost are inaccurate because they are based on speculation and erroneous assumptions. Defendants allege Andrews selectively picked the highest coil steel prices from Tie Down's invoices upon which to base his calculations of steel costs; therefore, Andrews' coil steel costs are not representative of the costs actually experienced by Tie Down. Defendants also maintain that Andrews' average total cost calculations are based on an erroneous scrap factor, arbitrarily selected by Andrews based on the scrap factor of U.S. Anchor, a smaller company which does not have the same purchasing power or efficiency as Tie Down. Andrews' coil steel cost also allegedly include incorrect shipping costs from the steel company to the slitter and incorrect freight cost from the slitter to Tie Down, and erroneous slitting and galvanizing costs. Defendants further allege that Andrews has used an erroneous "imputed profit" in his calculations of average total cost.

■ Again, the contested evidence about calculations of average total cost is exclusively for the jury. *McGahee*, 858 F.2d at 1495, n. 12. Moreover, several instances in which sales were below average variable costs, and presumably average total costs, are sufficient to overcome summary judgment and create an issue of fact under the Eleventh Circuit test for predatory pricing. *Id.* The amount of profit to be calculated into total economic costs is also an issue of fact. *Id.* at 1503, n. 35. Andrews expert opinion about the amount of profit to be included in average total cost is based on the average operating results for profitable companies engaged in the business of manufacturing fabricated metal products. *See* Exh. D attached to Andrews Second Affidavit. This evidence is sufficient to create a fact question as to the amount of profit to be included in average total costs.

The Eleventh Circuit's adoption of an average total cost standard in *McGahee* came at the close of discovery and after motions for summary judgment had been filed in this case. The average total cost is a more liberal standard than the Areeda–Turner average variable cost standard because it takes into account total cost. Plaintiff has presented sufficient evidence to create an issue of fact about below average variable cost. The Eleventh Circuit notes that average variable costs may be used as a substitute for short run marginal costs. *McGahee*, 858 F.2d at 1504. Andrews' First and Second Affidavits support such a substitution in the present case. *Id.* at n. 38. Therefore, under the Eleventh Circuit test, an issue of facts exists as to whether defendants priced below the short run marginal cost, based on the contested evidence of pricing below average variable cost.

Under *McGahee*, subjective evidence of predatory pricing must also be considered, in addition to cost analysis. Subjective evidence exists in the present case similar to that which existed in *McGahee*. Plaintiff has raised evidence that defendants investigated plaintiff's financial position and that defendants instituted new credits and discounts that plaintiff could not match. Webb Affidavit, ¶ 7; Humphrey Deposition, pp. 87–92; Gardner Deposition, p. 28; Hymel Deposition, pp. 19–20; Pressman Deposition, pp. 17–18; Read Deposition, pp. 39, 67; Chapman 7/15/87 Deposition, p. 56. Defendants' internal memoranda reflect a goal of contributing to U.S. Anchor's financial problems. Bracco Deposition, Exh. 6, p. 2; Anastos Deposition, Exhs. 11 and 2; and defendant reduced its prices to particular customers and offered new discounts. Anastos Deposition Exh. 14.

### B. *Dangerous Probability of Success*

The second requirement of an attempt to monopolize claim is "a dangerous probability of the defendant would succeed." *Ma-Gahee*, 858 F.2d at 1493. "[A] court must examine the relevant market and defendant's market power *before* the attempt to monopolized began. . . . The best test from which market power may be inferred is relative size, *i.e.*, the percentage of market share." *Id.* at 1505. In *McGahee*, the court held that "a sixty or sixty-five percent market share is sufficient to create an issue of fact as to whether there was a

dangerous probability" that the defendant could succeed in achieving monopoly. *Id.* at 1506.

■ Defendants argue that they are entitled to summary judgment because they do not possess nor do they come close to possessing monopoly power in the relevant market. An issue of fact, however, exists as to the relevant product and geographic markets.[4] The relevant geographic market area is in dispute. Plaintiff maintains that the geographic market is the continental United States. *See* Response to Second Interrogatories, No. 5; Chapman Deposition 7/15/87, p. 131. In contrast, defendants contend that the relevant geographic market is the United States and Canada. *See* Anastos Deposition, p. 97.

The parties also dispute the relevant product market with evidence, based on affidavits and depositions. Plaintiff claims that the relevant product market includes lightweight, galvanized penetrating anchors sold by U.S. Anchor and by Rule, including Rule's trademarked Danforth Standard models. Defendant's limit this product market definition to "generic" galvanized penetrating fluke-style anchor. Defendants' definition includes only seventeen anchor models manufactured by Tie Down, falling into the Super Hooker, Hooker Economy, and Hooker Slip–Ring anchors, [the "Hooker" line] and includes all anchor models manufactured by U.S. Anchor. Defendants' product market definition, however, excludes the Danforth Standard models.

■ The existence of a monopoly power is intertwined with the definition of the relevant product and geographic market. The question of relevant markets is ordinarily one for the jury. *Associated Radio Service,* 624 F.2d 1342, 1357 (5th Cir.1980). The court agrees with plaintiff that these factual issues are disputed. Since the relevant markets are contested, the court cannot assess the defendants' arguments that

low entry barriers and foreign competition preclude plaintiff's monopolization claims. Summary judgment, based on defendants' argument that they lacked a monopoly power in the relevant market, must be denied on plaintiff's Sherman Act claims.

## IV. EXCLUSIVE DEALING CLAIM UNDER § 1 OF SHERMAN ACT AND § 4 OF CLAYTON ACT

Plaintiff also alleges that Rule imposed an exclusive dealing arrangement upon its customers in violation of § 1 of the Sherman Act and § 4 of the Clayton Act. Plaintiff maintains that this tying arrangement further evidences Rule's intent to monopolize and to eliminate U.S. Anchor in violation of § 1 and § 2 of the Sherman Act. This alleged tying arrangement would also constitute an independent violation of § 3 of the Clayton Act.

Exclusive dealing arrangements violate § 3 of the Clayton Act, 15 U.S.C. § 14. Section 3 of the Clayton Act makes it unlawful to sell goods on the condition, agreement, or understanding that the purchaser shall not use or deal in the goods of a competitor of the seller, where the effect may be to substantially lessen competition or tend to create a monopoly. These types of tying arrangements are recognized as "inherently anticompetitive" because they tend to shut other sellers out of the market by "tying up" potential distributors or buyers. *Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962); *United States v. Loew's, Inc.,* 371 U.S. 38, 44–45, 83 S.Ct. 97, 101–102, 9 L.Ed.2d 11 (1962); *Barry Wright Corporation v. ITT Grinnel Corporation,* 724 F.2d 227, 236 (1st Cir.1983).

■ In the present case, the plaintiff alleges that Rule engaged in an "exclusive dealer" tying arrangement. In this type of illegal tying arrangement, the seller conditions the sale of his product upon the buy-

---

**4.** Defendants maintain that plaintiff's evidence is not expert economic evidence of the relevant market share because James Webb and Gary Potter are not economists. *American Key Corporation v. Cole National Corporation,* 762 F.2d 1569 (11th Cir.1985). Federal Rule of Evidence 702, however, provides that a witness may qualify as an expert "by knowledge, skill, experience, training; *or* education." (emphasis added). Potter and Webb's affidavits reflect extensive knowledge, skill, experience, and training in determining markets in the marine anchor industry. Accordingly, the court finds their evidence to be sufficient expert testimony.

er's promise not to buy similar products from the seller's competitors. *Northern Pacific Railway v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Plaintiff's tying claim is based on the fact that defendant Rule allegedly conditioned the sale of its new "Deepset" anchor upon the customer's promise not to buy galvanized penetrating fluke-style anchors from any other manufacturer. In September, 1985, Rule introduced the Deepset anchor line, which it described as a new and revolutionary product. Anastos Affidavit, ¶¶ 5–6. For two years thereafter Rule refused to sell this product to any customer who bought galvanizing penetrating fluke-style anchors from any source other than Rule. This fact has been confirmed by Rule's literature and Rule's customer's. Anastos Deposition, Exh. 11, 21, 22; York Deposition, pp. 23–26, 46; Howerth Deposition, pp. 12–14 and Exh. 1; Pressman Deposition, pp. 15–16 and Exh. 1; Landrith Deposition, pp. 35, 44–46 and Exh. 1; Bouchard Deposition pp. 28–29.

■■■■ An exclusive dealership is illegal if it is probable that the arrangement will foreclose competition in a substantial share of the line of commerce affected. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1960). To determine whether this has occurred, it is necessary to (1) identify the "line of commerce" involved; (2) identify the market area in which the defendant seller operates; and (3) determine whether the opportunities foreclosed by the exclusive dealing arrangement constitute a "substantial share" of the market in that area. *Id.* at 327–28, 81 S.Ct. at 627–28.

■■■ As seen, the evidence regarding the appropriate product and geographic markets is a contested factual issue appropriate for the jury's determination. Plaintiff's exclusive dealing arrangement claim is intertwined with these definitions. Accordingly, summary judgment on plaintiff's exclusive dealing claim under § 1 of the Sherman Act and § 3 of the Clayton Act would be inappropriate.

## V. PLAINTIFF'S OTHER CLAIMS

■■■ In Count V, plaintiff incorporates its previously stated allegations to state a claim under Georgia law for conspiracy to restrain trade in violation of Article 3, Section VI, Paragraph V of the Georgia Constitution and O.C.G.A. § 13–8–2. Plaintiff also seeks injunctive relief under the federal antitrust laws. Because issues of fact appropriate for the jury exist regarding whether there has been any unlawful conspiracies to restrain trade, threat of anticompetitive effect in the marketplace, or injury caused by any illegal conduct, defendants' motion for summary judgment on these claims must be denied.

## VI. DEFENDANT TIE DOWN'S COUNTERCLAIM

Defendant Tie Down brings a counterclaim against plaintiff U.S. Anchor and William Chapman. This counterclaim alleges a breach of fiduciary duty; misappropriation of confidential business information; tortious interference with business relations; and common law fraud and deceit. U.S. Anchor and William Chapman seek summary judgment on Tie Down's theories for relief in its counterclaim.

Defendant Tie Down contends that Chapman actively prepared to go into business in competition with Tie Down while still serving as President of Tie Down. Tie Down alleges evidence that in early 1985 while still employed by Tie Down, Chapman used Tie Down's resources, personnel and confidential business information to set up his competing business, U.S. Anchor. These allegations form the basis of Tie Down's counterclaim.

### A. *Breach of Fiduciary Duty*

■■■ As an officer of Tie Down and possibly as an employee of Tie Down, Chapman would have owed the corporation and his principal a fiduciary duty of good faith and loyalty. *See* O.C.G.A. § 14–2–152; O.C.G.A. § 23–2–58; *General Information Processing Systems, Inc. v. Sweeney,* 176 Ga.App. 315, 316, 335 S.E.2d 722 (1985); *Cochran v. Murrah,* 235 Ga. 304, 219 S.E.2d 421 (1975). An employee

breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. *E.D. Lacey Mills, Inc. v. Keith,* 183 Ga. App. 357, 362, 359 S.E.2d 148 (1987). However, an employee is not "entitled to solicit customers for [a] rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Id.* at 363, 359 S.E.2d 148, *citing,* Restatement 2nd of Agency, § 393 (1958). This fiduciary duty is also violated by making numerous arrangements for the competing business while still employed and by soliciting the employers' customers and sales representatives for the rival business. *Id.*

Chapman maintains that he did not contemplate starting a marine anchor company until after his January resignation, at which time he generally advised MacKarvich that he might end up in some form of competition with Tie Down. It was not until April 1985, when Tie Down entered into an agreement to sell its marine anchor division to Rule Industries, that he allegedly saw an opportunity to start a marine anchor company. Chapman contends that he did not solicit orders for U.S. Anchor from Tie Down's customers, or any potential customer, until approximately July, 1985, at least three months after the termination of his employment at Tie Down. Statement ¶ 30.

■ Tie Down has presented evidence that Chapman made significant business arrangements to organize a competing business and solicited Tie Down's sales agents while still employed by Tie Down. This evidence raises a genuine issue of fact for trial as to Tie Down's amended counterclaim breach of fiduciary duty. Accordingly, U.S. Anchor's and Chapman's motion for summary judgment on Tie Down's counterclaim is denied.

B. *Misappropriation of Confidential Business Information and Common Law Fraud and Deceit*

U.S. Anchor and Chapman also seek summary judgment on Tie Down's amended counterclaim for misappropriation about confidential business information and common law fraud and deceit. These claims are based on similar facts of whether Chapman obtained Tie Down's confidential business information through fraudulent misrepresentations or theft.

■ A cause of action for misappropriation of confidential business information exists when "[o]ne who, for the purposes of advancing a rival business interest, procures by improper means information about another's business...." Restatement of Torts § 759. *Wesley–Jessen, Inc. v. Armento,* 519 F.Supp. 1352, 1361 (N.D. Ga.1981); *Durham v. Stand-by Labor, Inc.,* 230 Ga. 558, 563, 198 S.E.2d 145 (1973). "Improper means" may include theft or fraudulent misrepresentation.

To establish a claim for fraud, a party must prove the following elements:

(1) The defendant made the representations;

(2) At the time the representations were made, the defendant knew they were false;

(3) The defendant made the representations with the intention and purpose of deceiving the plaintiff;

(4) The plaintiff relied on the representations;

(5) The plaintiff sustained the alleged loss and damage as the proximate result of the representations having been made.

*Bragg v. Sirockman,* 169 Ga.App. 643, 314 S.E.2d 478 (1984).

■ A cause of action for fraud may also arise when the failure to perform the promised act, even as to a future event, is coupled with a present intention not to perform. *Hayes v. Irwin,* 541 F.Supp. 397, 438 (N.D.Ga.1982), *citing Dye v. Dye,* 231 Ga. 533, 202 S.E.2d 418 (1973); *Cowart v. Gay,* 223 Ga. 635, 157 S.E.2d 466 (1967). An opinion as to a legal matter is actionable if there is a fiduciary relationship between the parties. *See Capriulo v. Bankers Life Co.,* 178 Ga.App. 635, 637–38, 344 S.E.2d 430 (1986); *Clinton v. State Farm Mutual Automobile Insurance Co.,* 110 Ga.App. 417, 138 S.E.2d 687 (1964).

U.S. Anchor and Chapman have presented evidence by affidavit that Chapman did

not possess or use any of Tie Down's confidential or proprietary business information. Chapman also maintains that his knowledge of manufacturing anchors, as well as the identity of potential anchor customers, was subjective knowledge, and was not derived from any confidential documents wrongfully obtained or retained outside the course of his normal employment. Statement, ¶ 29.

■ In rebuttal, Tie Down has presented evidence that Chapman obtained access to Tie Down's costing information for use in U.S. Anchor's business plan and gross profit analysis by misrepresenting to Mac-Karvich that he wanted to help recost Tie Down's products for Tie Down's benefit. MacKarvich Affidavit, ¶ 8. Tie Down also points to circumstantial evidence that Chapman misappropriated Tie Down's marine anchor engineering drawings, which were discovered missing upon Chapman's discharge from Tie Down. MarKarvich Affidavit, ¶ 9. U.S. Anchor's machinist, however, testified that the tooling and dies were not made or based on any of Tie Down's engineering drawings. Accordingly, there is an issue of fact that precludes summary judgment as to whether Chapman obtained confidential business information by improper means.

### C. *Tortious Interference With Business Relations*

■ U.S. Anchor and Chapman seek summary judgment on Tie Down's amended counterclaim for tortious interference with business relations. A claim based on tortious interference with business relations does not require evidence of a binding contract. *Integrated & Micro Systems Inc. v. NEC Home Electronics*, 174 Ga. App. 197, 200, 329 S.E.2d 554 (1985). Instead, the party charged with tortious interference with business relations must have "(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." *Id., quoting, Hayes v. Irvin*, 541 F.Supp. at 429.

■ Interference with an employment relationship can be tortious, even though the employment is at the will of the employer and employee. *See e.g., E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. at 362, 359 S.E.2d 148; *Nager v. Lad'N Dad Slacks*, 148 Ga.App. 401, 403, 251 S.E.2d 330 (1978); *Architectural Manufacturing Co. v. Airotec*, 119 Ga.App. 245, 248, 166 S.E.2d 744 (1969). Interference with the plaintiff's relationship with its customers, suppliers, or representatives will support a cause of action for tortious interference even though such relationships may be terminable at will. *E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. at 362, 359 S.E.2d 148.

■ Interference with business relations may be excused if privileged. *Orkin Exterminating Co., Inc. v. Martin Co.*, 240 Ga. 662, 667, 242 S.E.2d 135 (1975). "[I]n order for [the defendant] to come under the protection of the competition privilege, it must establish inter alia that it did employ improper means." *Integrated & Micro Systems Inc.*, 174 Ga.App. at 202, 329 S.E.2d 554. The privilege defense is not available where interference is achieved through actions taken in violation of a confidential relationship. *Hayes v. Irwin*, 541 F.Supp. at 430; *E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. at 364, 359 S.E.2d 148.

■ Chapman and U.S. Anchor argue that Tie Down cannot maintain this claim because Tie Down has only one marine anchor customer, Rule, since the inception of U.S. Anchor, and U.S. Anchor has never sold to Rule. Tie Down allegedly has not pointed to evidence that U.S. Anchor and Chapman induced Rule, the only party doing business with Tie Down, not to enter or to continue the business relationship.

The disputed evidence, however, is not limited to Tie Down's relationship with Rule. The parties dispute whether Chapman wrongfully interferred with Tie Down's business relations by soliciting Tie Down's key employees, mobile home and marine anchor sales representative, and marine anchor distributors. Tie Down maintains that Chapman made such solicitations while still employed at Tie Down in violation of the confidential relationship

owed Tie Down; therefore, no privilege exists.

Based on the above evidence, factual disputes exist, which are appropriate for the jury on Tie Down's amended counterclaim for tortious interference with business. Accordingly, summary judgment on this claim is also denied.

## VII. CONCLUSION

In sum, defendant Tie Down, Inc.'s Motion for Summary Judgment, defendant Rule Industries, Inc.'s Motion for Summary Judgment, and the motion of William Chapman and U.S. Anchor for Summary Judgment are all DENIED. Defendant Tie Down's motion to file a supplemental brief and an amendment to this motion is GRANTED.

SO ORDERED.